OTTO G. GELONECK *vs.* DEAN STEAM PUMP COMPANY.

Hampden.    September 24, 1895. — February 25, 1896.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Personal Injuries — Employers' Liability Act — Defective Appliance — Assumption of Risk — " Superintendence " — Unsuitableness of " Ways, Works, or Machinery " — Evidence.*

In an action for personal injuries occasioned to the plaintiff while in the defendant's employ by the falling upon him of a large iron pump, which, loaded upon a truck, he with others was moving from one part of the defendant's works to another, the question whether the plaintiff had assumed the risk of the accident is a question for the jury, in view of his contention that there were no washers on the truck, and that their absence constituted a defect.

Whether A., employed by the defendant as foreman of its yard, but who at times worked with his own hands, is one whose " principal duty is that of superintendence," within the meaning of the employers' liability act, St. 1887, c. 270, § 1, cl. 2, is a question for the jury in an action for personal injuries occasioned to the plaintiff while in the defendant's employ by the falling upon him of a large iron pump, which, loaded upon a truck, he with others was moving from one place to another in the defendant's works, in accordance with A.'s directions.

An unsuitableness of " ways, works, or machinery " for work intended to be done and actually done by means of them is a defect, within the meaning of St. 1887, c. 270, § 1, cl. 1, although they are perfect of their kind, in good repair, and suitable for some work done in the employer's business other than the work in doing which their unsuitableness causes injury.

In an action under the employers' liability act, St. 1887, c. 270, for personal injuries occasioned to the plaintiff by the falling upon him of a large iron pump, which, loaded upon a truck, he with others was moving from one part of the defendant's works to another, evidence as to other appliances which were at hand and other methods which might have been used to move the pump is admissible upon the question whether the defendant's superintendent was at fault in causing it to be moved as he did.

In an action for personal injuries occasioned to the plaintiff while in the defendant's employ by the falling upon him of a large iron pump, which, loaded upon a truck, he with others was moving from one part of the defendant's works to another, if the plaintiff contends that the absence of washers on the truck constituted a defect, evidence that the purpose of washers was to prevent the wheels from rubbing against and working out the pins, and not to prevent the truck or its load from shaking, is rightly excluded as immaterial.

TORT, under the employers' liability act, St. 1887, c. 270, for personal injuries occasioned to the plaintiff while in the employ of the defendant. Trial in the Superior Court, before *Dewey,* J., who allowed a bill of exceptions, in substance as follows.

The plaintiff was a blacksmith by trade, and had worked at his trade in Germany. He went to work for the defendant in September, 1893, and continued in its employ until May 23, 1894, the day of the accident. His occupation during that time was to carry different articles from one place to another in the defendant's manufactory. In doing this, he used a four-wheel truck when necessary, which had an iron handle about three feet long. When the load was a light one he would draw it himself, but when it was heavy others would help in the operation. One John Bergeron was the foreman of the gang in which the plaintiff worked, and Thomas Ryan was foreman of another gang. Both these gangs were engaged in moving pumps, parts of pumps, and other articles, around the defendant's manufactory, using the trucks above mentioned when necessary. On the day of the accident, the plaintiff was requested by his foreman, Bergeron, to accompany him, together with three or four other men from the same gang, to help move a pump which had been loaded on one of the trucks from the yard to the " testing room." This truck, with the pump thereon, was standing in the yard, twenty-five

or thirty feet from the northerly door of the machine shop. Ryan was there, and had some of his gang there, and it was in consequence of a request for aid made by him that Bergeron came out with his men to help in moving the pump. This pump had been fitted with a wooden shoe, which consisted of two pieces of scantling about the length of the pump, and the shoe was bolted to the pump. The purpose of this shoe was to facilitate the handling of the pump, and to allow the pump to lie upon the platform of the truck. Down through the centre of the machine shop ran a railway, which was about four feet and eight inches from rail to rail. This, after extend· ing in a straight line for about 170 feet, turned at right angles toward the right, and extended in a direct line through a side door of the machine shop out into a yard, and thence into the testing room, which was the room where the pumps were tested before shipment, the whole distance traversed being about 267 feet. The part of the railway from the turn-table through the centre of the shop was disused. There was evidence that planking had been laid between the rails over the entire route; that this track did not extend to within thirty or thirty-five feet of where the pump in question lay in the yard where it was first loaded on the truck; that both Bergeron's men and Ryan's men took hold, some pushing on the pump and others pulling on a rope attached to the truck handle when the moving of the pump began; that the pump was carried over the threshold of the north door into the machine shop; that, coming over this threshold, the wheels would have to drop down from the threshold an inch or more to get on to the planking between the rails; that at the turn-table, which was located where the track turned at right angles to go out of the side door of the machine shop, and again at the threshold of that door, the wheels of the truck dropped an inch or more in going over these places; that the truck, with the pump thereon, arrived in safety at the door of the testing room, but the first attempt to push the truck into the testing room failed; that the plaintiff had been pulling on the rope up to this time; that, upon the failure of the men to push the truck into the testing room, it was backed up three or four feet to get a new start; that, without being directed by any one, the plaintiff came back from pulling on the rope, and took

hold of the side of the pump, and was helping to push it up at the time of the accident ; that the door sill of the testing room was one inch or one inch and a half higher than the planking between the rails, and a board with bevelled slanting edge had been fitted to the edge of the threshold between the rails, in order that trucks might be pulled into the testing room ; that at the second trial the left wheel ran upon the threshold, but the right wheel failed so to do and caught on the threshold, and the handle turned to the right, and the right wheel got under the platform of the truck, and the pump fell off, catching the plaintiff between the door jamb and the pump, and he received the injuries complained of ; that a hand-car, which was used on that portion of the railway which ran from the turn-table in the machine shop into the testing room, was on the track inside the door of the testing room, with a pump loaded thereon ; that there were in use at the defendant's manufactory five trucks similar to the one in use at the time of the accident, and but one hand-car, mentioned above ; and that, when the pump reached the testing room door, the pump was straight on the truck.

The plaintiff, among other things, testified as follows : " I got hold of the rope and we first started to take the pump into the machine shop ; I think there were ten or twelve men there, some of them from the yard, and some of them from the machine shop. Tom Ryan, the yard boss, was there, and he gave orders ; as we went along through the machine shop, I was on the rope pulling ; the men were distributed so that some were on the rope and some on the pump, on the sides, and behind ; this rope was fastened on the handle, and was being used to pull the pump ahead ; we went through the machine room, out through the door, and then out into the yard again. . . . As we went towards the testing room, the wheels of the truck were running upon the planking between the rails of the track ; just when we got to the testing room, we stopped. . . . We had to stop, we could n't get any further ; after stopping, Ryan said we should push back ; we pushed the truck back between three and four feet ; afterwards he gave us orders to pull ahead again ; he said go on ; he told us to go off to the right side, going into the door of the testing room. After that, we tried the second time to go up, and the wheel at the left went over the threshold, and the

second one did n't, and the wagon and the pump both came over. I was between the pump and the wall, on the right hand side, when the pump came over; the left wheel went up all right, and the reason why the right wheel did n't go up was because it caught on the threshold. . . . I was never called upon before, while working for the defendant, to transport pumps to the testing room; Ryan had charge of the yard, loading and unloading." In answer to the question, " Whether or not Ryan used to work with his hands?" the witness answered, " Just telling the people to do their work, just taking charge of them."

Upon cross-examination he testified as follows: " When we started, Ryan was near the pump. Ryan followed along; I did n't see him help to push; I was not the one that was next to the pump; when the pump was pulled through the door from the yard to the machine shop, I was on the rope, and there were some pushing on the side and rear; Ryan did n't push; my back was toward the pump; Ryan stood on the side; I turned around and I saw him. . . . When we went through the door of the machine shop, on to the machine shop floor, the pump joggled a little."

Emil Thiebe, a witness for the plaintiff, testified as follows: " On the day of the accident I was called on by the boss of the machine room to help move a pump that was out in the yard, near the corner of the machine shop; when I got there, Tom Ryan was there with about five men for help. Ryan is yard boss; he gave orders to unload and load up; he just gave the orders about moving pumps and things of that kind; everything that came in he took charge of; once in a great while he did work with his hands. The pump was loaded on the truck, and was about fifteen feet long. . . . When we got to the door of the testing room we stopped. . . . Ryan was there, and he told me to go back, and we went back about three feet; Ryan showed us that we should turn more to the right; he showed us with his hands; then he went ahead again; I was on the rope, and we pulled again till we got there, and it fell over. . . . As the pump was carried along there through the machine room, and from the machine room to the testing room, along this planking, it shook; I never saw Ryan do anything only give orders."

John Bergeron, a witness for the plaintiff, testified as follows: " At the time of the accident, I was boss helper in the machine shop of the defendant.   On the day of the accident I was called on to give assistance and to have my men assist about moving a pump.   Ryan, the foreman of the yard, called on me ; Ryan was the man for loading freights and unloading freights, — what we call the yard boss.   With reference to the work that he did with his hands, sometimes I might have seen him picking up a little bit, but he was the man to give orders, and he had other men under his orders to do the work.   Aside from these times, he did n't work with his hands. . . . Ryan had orders to move the pump, and he gave us orders to move it right along all the way up to the time of the accident. . . . When we went through the machine shop Ryan was walking behind the pump. . . . The truck is about two and a half feet wide, and the wheels are hung under the truck.   We went along the planking, and as we were going along it I don't remember Ryan doing anything.   I saw this pump wabble quite a little while we were going along toward the testing room."

Upon cross-examination he testified as follows : " With the exception of the railroad car, this truck was the largest truck we had in use there; a man could lift one end of this truck easy ; there were five of these trucks there altogether; these trucks were used for doing the lumbering around the shop, also in the yard; and they were in general use.   If we wanted to move anything from the yard into the machine shop, whether it was a pump or a casting, or whatever it was, we used one of these trucks; we had the railway, but it was not in use. . . . The pump had been loaded and was on the truck; everybody could see how it was; it had these boards under it, and those were fastened to the pump, so that the pump could rest upon the platform of the truck, or else you could n't move it.   It was generally loaded with this shoe; I had hold of the rope, and others had hold of the rope, and there were others pushing; I could n't tell whether the plaintiff had hold of the rope or not; my face was toward the pump from the time I pulled it into the testing room."

Charles S. Newcomb, who was the defendant's superintendent, testified as follows : " This particular truck is a truck that is

usually used in moving such pumps as the one in question, and is a truck that is used for moving heavy substances of every kind.  I have seen this particular truck, or a truck of the same kind as this, used in carrying a pump as large as or larger than this over the course or over a part of the course that has been described here, into the testing room, without any falling off of the pump, a great many times.  This pump that injured the plaintiff weighed between 4,000 and 5,000 pounds, and I have seen pumps that would weigh six tons carried on trucks of this description.  The reason for using a truck of this description, instead of the hand-car that ran on the track, was that there was not a proper turn-table to transfer from the track to the testing room into the track down to the shop.  There was a turn-table, but we could n't use it, and we discarded using the car down through the shop soon after we built the shop."

Upon cross-examination he testified as follows: " We could take this pump as it came in thirty feet from the yard, and fasten it to the travelling crane, and carry it down to the turn-table; we would have to load it on the truck in the yard, bring it into the machine shop, put it on this heavy crane, which is not adapted to that kind of work at all, and then raise it up, and carry it down to the turn-table and load it on the car there, and run it out into the testing room and unload it there with another crane, and put it where we wanted it in the testing room.  We could have done that."

Thomas Ryan testified for the defendant as follows: " I am yard foreman in the employ of the defendant, and have from eight to ten or twelve men in my charge.  In addition to my duties in ordering these men around, I have to load and unload principally; I work with my hands like the rest of them.  Before I went to see Bergeron, the pump that has been described here had been loaded on a truck, — either this particular truck or one similar; they are all the same size. . . . In going over the threshold of the north doorway of the machine shop, the truck went right over, and we had no trouble; it dropped about two inches; when we got over the door, running the truck along on smooth floor, there was no joggling or tipping of the pump at all.  I followed up the truck as we went along till we came to this incline, then I pitched in and pushed. . . . I had nothing

whatever to say to the plaintiff with reference to his taking his place there; I did n't speak to any of the men that Bergeron brought out; I told him what I wanted, and he called them to help me; I worked there for some time, and have used this particular kind of a truck all the time I worked there. I don't know whether or not the plaintiff had plenty of room to push this pump from the rear; I used that truck successfully in moving pumps as large, as heavy, and as wide as this pump, and have moved this kind of pump frequently with that kind of truck; I have moved a great deal heavier pumps with this kind of truck, — twice as heavy. I had never spoken to the plaintiff before the accident, but had seen him working around the shop, and these trucks were the principal tools that he worked with. This scantling is bolted on to the pump with lag screws, and that is put on every pump and is shipped with it; it is put on for the purpose of handling the pump; when I took hold of this pump to help it over the door sill, I did not find the slightest joggle or unevenness, or anything of that kind about it; the pump was probably about twelve feet long; it was the usual practice in our establishment, in moving pumps of this length and the general style and weight of this pump, to use a rope for men to pull on the handle. . . . I could n't say whether this pump projected at all beyond the truck, but it should not have projected, because it was n't any bigger than the truck; there was plenty of room to swing in there; at the time of the accident, I was in the rear helping to push the pump up."

A truck similar to or the same as the truck which was being used at the time of the accident was exhibited to the jury during the trial. Upon this truck there were no washers on the axle between the axle-pin and the outside edge of the hub of the wheel. The plaintiff contended that this constituted a defect, and cross-examined the witness with reference thereto, as follows :

" *Q.* I notice as you move these wheels round, Mr. Ryan, there is a little space in here, to move. Is that the way that that was at that time ? *A.* I don't know.

" *Q.* That is to say, on all the wheels, is n't it about an inch or so of play? *A.* No, we had washers on them, between the pins.

" *Q.* Was that so at that time, — that play there? *A.* No, I guess not.

" *Q.* Did it have washers on it then? *A.* On the hind ones.

" *Q.* I mean on the front ones? *A.* We had them on the front, too.

" *Q.* When did you take the washers off? *A.* I did n't take them off.

" *Q.* Were they ever on there? *A.* Yes, sir.

" *Q.* When did you miss them off that truck? *A.* I did n't miss them off that truck till I saw it here.

" *Q.* This is the first time you ever saw that truck without the washers on the forward wheels? *A.* Yes, sir.

" *Q.* Did you bring that truck down here? *A.* No, sir.

" *Q.* Who brought it down? *A.* The expressman.

" *Q.* Did you pick out the truck for them to bring down? *A.* No, sir.

" *Q.* Do you tell this jury, Mr. Ryan, that that truck was not in the same condition on the 23d of May, 1894, that it is to-day? *A.* Not as I know of.

" *Q.* What do you mean by that? Do you mean to say there has been any change in that truck since May, 1894? *A.* The washers get lost occasionally.

" Question repeated. *A.* I don't know about that particular truck. I did n't help with my hands to shove this truck with the pump on it till I got where the accident was; that was the first time I laid my hands upon the truck or pump; up to that time I had given directions; I gave all the orders; I had entire charge and control; I did not select the truck on this day; I sent one of the men after a four-wheeled truck, and did n't tell him what particular truck to get. I made no examination of it."

After the plaintiff had so cross-examined this witness, the defendant, on redirect examination, asked him the following question: " What is the purpose of these washers?" To this question the plaintiff objected. The defendant offered to show that the purpose of the washers was not to prevent the pump or truck from shaking, but to prevent the wheels from rubbing against the pin, and working the pins out.

The judge excluded the evidence; and the defendant excepted.

Charles D. Heywood, who was the defendant's assistant superintendent, testified as follows : " I have visited all the large pump shops here in the East; they use practically the same kind of trucks, the same size and build ; a truck of this same description is in common ordinary use in the iron manufactories and pump shops for moving bodies of the same general description as the pump that was on the truck on the day of the accident. I have known these trucks to be used with a rope, and they carry them over ordinary plank floors and door sills, through doorways."

The following testimony of the witness was admitted, against the defendant's objection and exception :

" *Q.* What other methods were used up there for transporting heavy casting ?   *A.* Well, we have got what we call a travelling crane.

" *Q.* What is that ?   *A.* For transporting heavy articles from one end to the other of the shop.

" *Q.* Won't you just describe it?   *A.* It takes from one end of the shop to the other, but you can't get into the testing room with it. It was only for moving heavy castings from one doorway up to the setting-up room.

" *Q.* How far is that?   *A.* The length of the shop, pretty near.

" *Q.* About how many feet?   *A.* About 250 or 300 feet, something like that.

" *Q.* Is it to be used only in the machine room, or to run out in the yard?   *A.* We don't run it out in the yard.

" *Q.* Won't you just tell us how it is used ?   *A.* When all the heavy castings come in from the foundry, something that weighs seventy-two or seventy-five hundred pounds, if we come right in the door, we generally take it up with what we call the big heavy crane, and we hoist up with power chains whatever we have got to lift, and there is a long shaft that goes from one side to the other, and this travelling crane travels that piece right along the shop, from one end to the other.

" *Q.* Can you use that at the door where the pumps come into the machine shop?   *A.* Yes, sir.

" *Q.* Whether or not it was used to load castings on this handcar ?   *A.* Yes, sir.

" *Q.* Was there any other method by which large pumps and castings were sometimes moved into this testing room or elsewhere ? *A.* We generally move them on these small trucks, and we move on that big heavy truck.

" *Q.* Any other way ? *A.* We moved small pieces with two-wheeled trucks.

" *Q.* Any other way? *A.* No, sir.

" *Q.* Whether or not rollers were used ? *A.* Well, we had used rollers quite a little.

" *Q.* What kind ? *A.* Wooden.

" *Q.* About how large? *A.* Four or five inches in diameter."

At the conclusion of the evidence, the defendant asked the judge to give the following instructions, among others:

" 1. There is no sufficient evidence that the injury to the plaintiff did not result from one of the risks of the employment assumed by him, and the verdict should therefore be for the defendant. 2. There is no sufficient evidence that the plaintiff was injured by the negligence of a person having charge of the ways, works, and machinery, and there can be no recovery on that ground. 3. There is no sufficient evidence that the plaintiff was injured by any defect in the ways, works, and machinery for which the defendant is responsible to the plaintiff, and there can be no recovery on that ground. 4. There is no sufficient evidence that the plaintiff's injuries were caused by the negligence of a superintendent, or by the negligence of one whose sole or principal duty was that of superintendence, and there can be no recovery on that ground. 5. There is no sufficient evidence that Ryan was either a superintendent, or a person whose sole or principal duty was that of superintendence at the time of the accident."

The judge refused to give these instructions, but instructed the jury in part as follows:

" The plaintiff rests his case here upon two main grounds. One ground is, he says, that through the negligence of the defendant, or of somebody acting for the defendant having charge of its ways, works, or machinery, there was a defect in the ways and the works and the machinery, and that that defect contributed as a direct cause to the plaintiff's injury. The question is, whether there was a defect in the ways, works, and machin-

ery, within the meaning of the law, that contributed directly as a proximate cause to produce this injury, and whether that defect, if it existed, existed through the negligence of the defendant corporation, or of somebody representing it in the care of its ways, works, and machinery. The plaintiff claims that you ought to be satisfied that the relation of things, as they are disclosed by the evidence, was such as to render the defendant's establishment, its works, its machinery, its appliances, with reference to the work which the plaintiff was called upon to do, not reasonably safe and suitable. Of course, it is not necessary, under this statute, that any particular instrument should be defective in itself; I mean by that, that it should have a flaw in it. For instance, take this truck. It is not necessary that the plaintiff should show that there was a fault in the truck, that it had a cracked wheel, or a broken axle-tree, or something of that kind, that gave way. In the sense of the law, a thing may be found, if the jury are satisfied that it ought to be found, to be not reasonably safe and suitable, if it is insufficient and unsuitable for the purposes to which it is applied and intended to be applied, and under the conditions under which it is used and intended to be used. . . . So, generally, I suppose, where you have to consider a set of arrangements in a mill, or around a factory or iron works, the question is not limited to whether there is something that has got a weak spot in it, something that has got a crack, or something that is decayed, but it is a little broader than that. It involves an inquiry as to whether the appliances, as they are put together, and used, and intended to be used, are reasonably safe and suitable. So, here, the plaintiff says you ought to be satisfied — taking this truck in the way in which it was constructed and used, and the track, and the door sills over which the truck was to be hauled in transporting these pumps and other heavy things — that the arrangements there, taken together, were not reasonably safe and suitable arrangements, and that the defendant, or whoever acted for the defendant, would, in the exercise of reasonable and ordinary care, have known it. On the contrary, the defendant says they were reasonably safe, they were suitable, there was no neglect. They had been used for an indefinite length of time with no accident. The defendant says, and says truly, we are not

obliged to have a faultless arrangement in our mill. We are not obliged to have things so that nobody could find any fault. The law does not require that. We are to have them reasonably safe and suitable. At any rate, we are to use reasonable and ordinary care that they may be. And if reasonable and ordinary care has been used about them, then the defendant is not responsible upon this point, even if there was a defect, because the law holds and intends to hold the defendant in these cases responsible only where the defendant itself, or somebody authorized to act for it in regard to the matter, has failed to use reasonable and ordinary care; in other words, has been negligent. Negligence on the part of the defendant, or somebody authorized to act for the defendant, is the gist of the liability.

" The plaintiff also says that, aside from this question of whether there was a defect, within the meaning of the law, in the truck and in the car, and in the arrangements that were made as to how the car should be used and operated, there is another ground on which the defendant is liable to him in this action, and that ground is the negligence of Ryan, acting as superintendent and directing the movement and transportation of this pump. . . . The statute provides that it must be the negligence of a person who is exercising superintendence, or whose principal duty is superintendence, and it must be a negligence occurring while he is exercising this function of superintendence. And the courts say the statute contemplates that the same man may occupy two positions; that is, he may be superintendent, it may be his principal duty to act as superintendent, but he may at times work with his own hands. In such a case as that, if there is any negligence, it must be when the man is exercising superintendence, and not when he is working with his own hands. . . . To come right down to the time of this accident, the plaintiff says that Ryan was guilty of negligence, in the first place, in loading this pump on to this truck; that there were other means there that he could have used, — there were rollers, and there was a hand-car. You have heard that matter discussed, you have heard the reasons why a hand-car was not used and why a roller should not be used. But the plaintiff says Ryan was negligent in loading this pump on to this truck, instead of ordering it to be moved in some other way, and that that neg-

ligence contributed directly to the injury; and that Ryan was negligent in the manner in which he directed the matter of undertaking to carry this pump into that testing room. . . .

"There is evidence tending to show that, after Ryan gave the order, he took hold himself, with the other men, to push. That illustrates the distinction which I have been stating to you. If Ryan did give, under all the circumstances, a negligent order, that is, an order that was not consistent with reasonable and ordinary care to give, and the giving of that order caused the truck to be handled in such a way as to cause the injury to the plaintiff, then you can find, if you think you ought to, that the negligence of Ryan, while he was acting as superintendent, contributed to produce this injury, although, after having given the order, he went to work with his own hands to help push the truck in. On the contrary, if there was nothing wrong in the order, if the order was all right, consistent with due care, and the difficulty arose by reason of an improper handling of the truck and pump after the order was given, that would not be a negligence existing while Ryan was exercising superintendence. . . .

"The defendant, while it denies there was any defect, while it denies there was any negligence on the part of Ryan, says that, so far as the plaintiff relies upon any alleged defect in the truck, in the plank walk or road or bed over which the truck was rolled, or in the condition of things at the threshold, or any of those matters, they were permanent, there was no change, they were the same one day and one week and one month with any other. They were open for the plaintiff's observation, and he worked there for some time, and, according to his own evidence, the defendant contends that he knew about them, and, if not safe, that you ought to find that he knew about them, or, in the exercise of reasonable or ordinary care, that he would have known about them; that there was nothing about those matters that he had not the experience and intelligence to judge of, — nothing secret, nothing concealed, nothing that he could not understand; and so they say, if he chose to continue to work under those conditions, well known to him, well understood by him, that he accepted the risk, and those matters are not any longer a ground of complaint on his part. And such is the law, if you find the facts to be so. The courts say that it is not in accordance with the spirit

of the law, and is not in accordance with the principles of the law, that a servant should maintain an action against his employer for damages occurring to him, the servant, from a condition of things that was permanent, and was well known and understood by him, and with reference to which he chose to continue his service. And so the law expresses it briefly, and says that in such cases as that he is to be held to have assumed the risk of whatever injury comes to him from those well known conditions."

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

The case was submitted on briefs to all the judges.

*W. H. Brooks & W. Hamilton,* for the defendant.

*J. B. Carroll & W. H. McClintock,* for the plaintiff.

BARKER, J. In the opinion of the majority of the court, the exceptions should be overruled.

1. Whether the plaintiff was hurt by an occurrence the risk of which he had assumed was a question for the jury, because of the plaintiff's contention that there were no washers on the truck, and that their absence constituted a defect, which questions of fact it appears by the bill of exceptions were left to the jury without objection on the part of the defendant.

2. The ruling that there was no sufficient evidence that the plaintiff's injuries were caused by the negligence of one whose sole or principal duty was that of superintendence was rightly refused. Upon the evidence, whether Ryan stood in that relation was a question of fact. See *O'Neil* v. *O'Leary,* 164 Mass. 387.

3. The jury was instructed in substance, that, to constitute a defect in the condition of the ways, works, or machinery, it was not necessary that any particular instrument should be defective in itself; that, for instance, the plaintiff need not show that there was a fault in the truck, that it had a cracked wheel, or a broken axle-tree, or something of that kind which gave way; that in the sense of the law a thing may be found to be not reasonably safe and suitable if it is insufficient and unsuitable for the purposes to which it is applied and is intended to be applied, and under the conditions in which it is used and is intended to be used; that the question is not limited to whether there is something which has a weak spot, or a crack, or is decayed,

but it involves the inquiry whether the appliances, as they are put together and used and intended to be used, are reasonably safe and suitable. In connection with this instruction the jury was also told that the defendant was not obliged to have a faultless arrangement, or one with which nobody could find any fault, but only to use reasonable care to have things reasonably safe and suitable.

These instructions were correct. An unsuitableness of ways, works, or machinery for work intended to be done and actually done by means of them, is a defect within the meaning of St. 1887, c. 270, § 1, cl. 1, although the ways, works, or machinery are perfect of their kind, in good repair, and suitable for some work done in the employer's business other than the work in doing which their unsuitableness causes injury to the workmen. In such a case the employer is wrong in furnishing appliances for a use for which they are unsuitable, and in effect in so ordering and carrying on his work that, without fault of the ordinary workman, the natural consequence will be that the appliances will be used for purposes for which they are unsuitable.

The circumstance that the employer intends that his work shall be done in the manner and by the means in use when the accident occurs distinguishes the case from those in which he furnishes a stock of appliances from which the workman is to select such as are fit for the particular work in hand, as in *Zeigler* v. *Day*, 123 Mass. 152; *Johnson* v. *Boston Tow-Boat Co.* 135 Mass. 209; *Carroll* v. *Western Union Telegraph Co.* 160 Mass. 152; *Allen* v. *Smith Iron Co.* 160 Mass. 557. Such an unsuitableness is neither accidental nor temporary, nor due to the negligence of a workman who is not charged with the duty of attending to the fitness of the ways, works, and machinery; and this circumstance distinguishes the present case from *Ashley* v. *Hart*, 147 Mass. 573; and from *O'Connor* v. *Neal*, 153 Mass. 281; *O'Keefe* v. *Brownell*, 156 Mass. 131; *Beauregard* v. *Webb Granite & Construction Co.* 160 Mass. 201; and from *Carroll* v. *Willcutt*, 163 Mass. 221. An employer cannot say that he is not in fault, if his ways, works, and machinery, when used as he intends them to be used, are unsuitable for his work. See *Smith* v. *Baker*, [1891] A. C. 325.

4. The evidence as to other appliances which were at hand,

and other methods which might have been used to move the pump, was admissible upon the question whether the superintendent was at fault in causing it to be moved as he did.

5. Whether the absence of washers would make the truck defective did not depend upon the purpose they were intended to serve, but upon their actual effect. Evidence that the purpose of washers was to prevent the wheels from rubbing against and working out the pins, and not to prevent the truck or its load from shaking, was immaterial. Whether it was a proper matter for expert testimony we do not consider.

*Exceptions overruled.*